No. 14-80137
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

MATTHEW EDWARDS, ET AL.,

*Plaintiffs-Respondents,*

v.

NATIONAL MILK PRODUCERS FEDERATION, A/K/A COOPERATIVES WORKING
TOGETHER, ET AL.,

*Defendants-Petitioners.*
_____

Petition to Appeal from the United States District Court
for the Northern District of California
Civil Action No. C 11-04766 JSW
Honorable Jeffrey S. White, Presiding
_____

## OPPOSITION TO PETITION FOR PERMISSION TO APPEAL
## FROM ORDER GRANTING CLASS CERTIFICATION
_____

HAGENS BERMAN SOBOL SHAPIRO LLP
Elaine T. Byszewski
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
(213) 330-7150

HAGENS BERMAN SOBOL SHAPIRO LLP
Steve W. Berman
Craig R. Spiegel
1918 8th Avenue, Suite 3300
Seattle, WA 98101
(206) 623-7292

[Additional Counsel and Parties Listed in Signature Block]

*Counsel for Plaintiffs-Respondents*

## CORPORATE DISCLOSURE STATEMENT

Respondent Boys and Girls Club of the East Valley is a nongovernmental non-profit corporate party in this proceeding.  Respondent Boys and Girls Club of the East Valley hereby states that it has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................1

II.  STATEMENT OF ISSUES ....................................................................2

III.  STATEMENT OF FACTS .....................................................................3

IV.  STANDARD OF REVIEW ....................................................................5

V.  THE PETITION SHOULD BE DENIED ...............................................5

     A.  Defendants Fail to Meet Their Burden of Establishing a
         Death Knell .....................................................................................5

     B.  Defendants' Claim That They Were Entitled to a *Daubert*
         Reply Brief Does Not Raise a Fundamental Issue Relating
         to Class Actions ..............................................................................7

     C.  Defendants Do Not Establish Manifest Error on the Face of
         the Petition.                                             9

         1.  It Was Not Manifest Error for the District Court to
             Accept Plaintiffs' Common Methods of Proving
             Overcharges. .................................................................9

         2.  The District Court Performed a Rigorous Analysis
             and Properly Found That Dr. Connor Provides a
             Reliable Method to Demonstrate Impact and
             Damages Using Common Evidence. .............................13

         3.  Defendants Fail to Establish Manifest Error That Will
             Inevitably Result in Reversal on the Issue of Pass
             Through. .......................................................................16

VI.  CONCLUSION ...................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aburto v. Verizon Cal., Inc.*,
    No. C 11-03683-ODW, 2012 WL 10381 (C.D. Cal. Jan. 3, 2012) ...................15

*Bazemore v. Friday*,
    478 U.S. 385 (1986)..................................................................................12, 15

*Chamberlan v. Ford Motor Co.*,
    402 F.3d 952 (9th Cir. 2005) ............................................ 5, 6, 7, 8, 9, 14, 15,18

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ...............................................................7, 13, 15

*In re Flash Memory Antitrust Litig.*,
    No. C 07-0086-SBA, 2011 WL 1301527 (N.D. Cal. Mar. 31, 2011) ...............14

*In re Graphics Processing Units Antitrust Litig.*,
    526 U.S. 137 (1999)..........................................................................................20

*In re Kumho Tire Co. v. Carmichael*,
    253 F.R.D. 478 (N.D. Cal. 2008).......................................................................7

*In re Methionine Antitrust Litig.*,
    204 F.R.D. 161 (N.D. Cal. 2001).....................................................................20

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008)..........................................................................18, 19

*In re OSB Antitrust Litig.*,
    No. 06-826, 2007 WL 2253425 (E.D. Pa. Aug. 3, 2007)..................................20

*Quezada v. Con-Way Freight, Inc.*,
    No. 09-CV-03670-JSW, 2012 WL 4901423 (N.D. Cal. Oct 15, 2012) ..............8

*In re Rail Freight Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013).........................................................................20

*In re Southeast Milk Antitrust Litig.*,
    739 F.3d 262 (6th Cir. 2014) ...........................................................................17

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
No. 07-01819 CW, 2010 WL 5071694 (N.D. Cal. Dec. 7, 2010).......................17

*Stockwell v. City & Cnty. of San Francisco*,
749 F.3d 1107 (9th Cir. 2014) ...............................................................15, 16, 18

*Suchanek v. Strum Foods Inc.*,
764 F.3d 750 (7th.Cir. 2014) ..............................................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011).........................................................................................16

**RULES**

Fed. R. Civ. P. 23 ......................................................................1, 2, 5, 9, 13, 14, 23

N.D. Cal. L.R. 7-3 ..............................................................................................7, 8

**OTHER AUTHORITIES**

MANUAL FOR COMPLEX LITIGATION § 11.32 ...........................................................8

## I.    INTRODUCTION

This case is extraordinary, because Defendants do not contest that they engaged in naked output restraint – members of the cartel agreed to and did in fact kill more than 500,000 cows in order to reduce the nationwide supply of milk so as to raise prices.  Even more extraordinary, Defendants hired an expert, Dr. Brown, to annually measure the cartel's returns on investment from the cow-slaughter program.  Dr. Brown found that the conspiracy had its intended effect of raising raw milk prices nationwide by $12 billion.  And he explained that "[o]ne of the reasons the CWT[1] remains successful in generating income for dairy producers rests in how inelastic the demand for milk and milk products remains."[2]  Plaintiffs' expert, Dr. Connor, agrees with Dr. Brown that the slaughter program caused higher minimum raw milk prices.  And Dr. Connor extends Dr. Brown's analysis to reach the economically consistent conclusion that the conspiracy also success- fully raised the over-order premium portion of raw milk prices, which are passed on to consumers at retail.  Moreover, Defendants' documents acknowledge pass through to consumers:  "Retail prices tend to rise quickly when farm prices rise."[3]  Based on these extraordinary facts, the district court properly certified the Classes.

Defendants now seek review under Rule 23(f) but do not establish that the

---

[1] CWT is the acronym for defendant Cooperatives Working Together.

[2] ECF No. 187-72.

[3] *E.g.*, ECF No. 187-97.

certification decision falls within any of the three limited categories for rare inter-locutory review. First, Defendants fail to establish a death knell situation, as they make no showing that the potential liability overwhelms the vast resources of the largest dairy cooperatives in the country. *See* Section V(A).

Second, Defendants do not raise a fundamental issue relating to class actions merely because they had "no right of reply" on their *Daubert* motion. This was a routine issue of case management before the district court, which considered and rejected their *Daubert* arguments. *See* Section V(B).

Third, Defendants do not establish manifest errors that inevitably result in reversal. Instead, the district court stated and applied the correct legal standard by engaging in a rigorous review of the evidence to determine that Rule 23 had been satisfied. The record fully supports the district court's determination that Plaintiffs proposed a reliable method to demonstrate impact and damages using common evidence. *See* Section V(C). Defendants' Petition should be denied.

## II. STATEMENT OF ISSUES

(1) Have Defendants, who are multi-billion dollar agri-business giants that do not provide any evidence of their inability to withstand judgment, met their burden of establishing that continued litigation runs the risk of ruinous liability?

(2) Have Defendants, who failed to seek relief from a local rule requiring that objections to evidence in support of a motion be contained in opposition to

- 2 -

that motion, raised a fundamental issue of law relating to class actions because the district court struck their separate *Daubert* reply brief?

(3)    Have Defendants established manifest error that inevitably will be overturned, where the district court engaged in a rigorous analysis before concluding that "Plaintiffs have met their burden to demonstrate that damages from Defendants' alleged unlawful conduct may be calculated on a classwide basis," and where that conclusion finds ample support in the record?

### III.    STATEMENT OF FACTS

CWT was formed in 2003 with the sole stated intention "to strengthen and stabilize milk prices."[4]  Defendants' goal was to raise milk prices, and their means to achieve their goal was to artificially reduce milk supply by prematurely killing hundreds of thousands of dairy cows.  Defendants' post-hoc justification for the conspiracy – to aid farmers in shifting their cattle herds to beef production[5] – finds no support in the contemporaneous record.  In fact, during the cow-slaughter process, CWT expressly disclaimed any responsibility for marketing beef.[6]

"[B]y September 2005, membership in CWT consisted of farmers who collectively represented 74% of the nation's milk supply, with nearly 50 dairy

---

[4] ECF No. 187-5.

[5] Petition at 1.

[6] ECF No. 234 (Second Am. Consol. Compl.), ¶¶ 6, 8 ("Producer shall be responsible for marketing The Cows and negotiating the terms of any such sale with a slaughterhouse.").

cooperatives and more than 300 individual farmers voluntarily participating."[7] From 2003 to 2010, Defendants conspired to limit the production of raw farm milk through ten rounds of "herd retirements."[8] Each Defendant paid assessments to CWT of $0.05 and later $0.10 per hundredweight of milk produced in order to pay dairy farmers to kill their herds.[9] CWT then spent hundreds of millions of dollars to kill dairy cows from 2003 to 2010.[10] In 2009 alone, "the CWT program collected $219 million from membership assessments and disbursed $217 million to farmers pursuant to the herd retirement program."[11] One of the herd slaughters in that year removed "367 herds in 41 states, comprised of about 101,000 cows."[12] Indeed, the premature herd slaughters occurred in every state in the contiguous United States, except for Rhode Island.[13]

As touted by the cartel's own real-time economist, whom it hired to measure the conspiracy's effectiveness, the premature killing of more than 500,000 cows was a resounding success, reducing the nation's milk supply by about ten billion pounds and increasing cumulative milk prices by over $12 billion.[14]

---

[7] ECF No. 235 (Joint Answer), ¶ 64.

[8] *Id*. at ¶ 14; ECF No. 187-8.

[9] ECF No. 187-12.

[10] ECF No. 187-10.

[11] ECF No. 235 (Joint Answer), ¶ 11.

[12] *Id*., ¶ 87.

[13] *See* ECF No. 258-7. There were no premature herd slaughters in D.C. either.

[14] ECF No. 187-8; ECF No. 187-14.

## IV.   STANDARD OF REVIEW

In *Chamberlan v. Ford Motor Co.*, this Court cautioned that "petitions for Rule 23(f) review should be granted sparingly" in "rare cases."[15]  This Court thus concluded that the rare case warranting such "disfavored" Rule 23(f) review must "ordinarily" come within one of these categories:

> (1) there is a death-knell situation …, coupled with a class certification decision by the district court that is questionable;
>
> (2) the certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review; or
>
> (3) the district court's class certification decision is manifestly erroneous.[16]

None of these factors support Rule 23(f) review here.

## V.   THE PETITION SHOULD BE DENIED

### A.   Defendants Fail to Meet Their Burden of Establishing a Death Knell.

Defendants must "sufficiently demonstrate" that "a grant of certification may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability."[17]  But Defendants' only argument is that interlocutory review is needed because "the certification of claims

---

[15] 402 F.3d 952, 959 (9th Cir. 2005).  Internal citations and quotations omitted and emphasis in original unless otherwise indicated.

[16] *Id.*

[17] *Chamberlan*, 402 F.3d at 957.

totaling, by Plaintiffs' estimate, up to $4 billion after trebling creates a death-knell situation that may defeat end-of-case review."[18]  This does not satisfy Defendants' burden.  As in *Chamberlan*, Defendant here have made "no showing that [they] lack[] the resources to defend this case to conclusion and appeal if necessary or that doing so would run the risk of ruinous liability."[19]  Instead, Defendants' claims are "conclusory and are not backed up by declarations, documents, or other evidence" demonstrating their financial condition.[20]

Moreover, Defendants are massive agri-business entities, including the two largest dairy cooperatives in the country.[21]  Land O'Lakes had over $14 billion in revenue in 2013[22] and ranked 194 on the list of Fortune 500 companies,[23] while Dairy Farmers of America had close to $13 billion in revenue in 2013.[24]  Further,

---

[18] Petition at 9.  Note that this is not a case where Defendants argue damages of some lesser amount – their expert claims on the merits that there is no impact at all in at least seven Class states.  *See* ECF No. 211-13 (Mr. Kaplan Decl.), ¶ 67; *cf.* ECF No. 257-4 (Dr. Connor Supp. Rebuttal), ¶ 25.  Indeed, Defendants' actions belie the financial threat they claim – having asserted that settlement discussions are premature.  *See* ECF No. 276 at 7.

[19] 402 F.3d at 960.

[20] *Id.*

[21] ECF No. 235 (Joint Answer), ¶¶ 43-44.

[22] Land O' Lakes, Inc., Land O'Lakes, Inc. 2013 Annual Report, Highlights of 2013 (2013), *available at:* http://www.landolakesinc.com/-stellent/groups/public/@lolinc/documents/web_content/ecmp2-0183311.pdf.

[23] *Fortune 500 2014*, Fortune, Time Inc., 2014, *available at:* http://www.fortune.com/fortune500/land-olakes-inc-199/.

[24] Dairy Farmers of America, Inc., DFA Reports 2013 Financial Results (Mar. 19, 2014), *available at:* http//www.dfamilk.com/newsroom/press-releases/dfa-reports-2013-financial-results.  *See also* ECF No. 235 (Joint Answer), ¶ 43.

the cow-slaughter program involved 70% of the dairy industry in the country,[25]

from which Defendants could seek contribution. Thus, the "potential recovery

here may be unpleasant to a behemoth company [but] is hardly terminal."[26]

**B.    Defendants' Claim That They Were Entitled to a *Daubert* Reply Brief Does Not Raise a Fundamental Issue Relating to Class Actions.**

Defendants incorrectly assert that interlocutory review should be granted to

resolve "whether a party seeking the exclusion of an expert at the class certification

stage has the right to pursue that remedy by filing a separate motion."[27]  Defend-

ants take issue with the district court's decision to strike Defendants' reply brief in

support of their *Daubert* motion under Local Rule 7-3, which requires evidentiary

objections to any motion to be set out in the 25-page opposition to the motion

absent prior Court approval.[28]

But a "trial court has broad latitude not only in determining whether an

expert's testimony is reliable, but also in deciding *how to determine* the testi-

mony's reliability.[29]  That "broad latitude" encompasses whether to permit a reply

brief in support of a *Daubert* motion.  Indeed, because "[m]otion practice can be a

source of substantial cost and delay," the Manual for Complex Litigation advises

---

[25] ECF No. 235 (Joint Answer), ¶ 64.

[26] *Chamberlan*, 402 F.3d at 960.

[27] Petition at 3-4, 19-20.

[28] N.D. Cal. L.R. 7-3(a), (d).

[29] *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)) (emphasis added).

district courts to consider "requiring leave of court for filing of reply or supplemental briefs."[30]  This is not an issue of fundamental importance to class actions but rather a routine issue of case management as to all motions.

Moreover, this issue is not important to this litigation, as also required by *Chamberlan*,[31] because Defendants did not seek leave to file a separate *Daubert* motion and reply.  Instead, Defendants filed a *Daubert* motion that simply incorporated by reference portions of their class certification opposition brief.[32] Plaintiffs responded to those arguments in their class certification reply brief, as required by Local Rule 7-3,[33] and the district court struck Defendants' subsequent *Daubert* reply[34] as violating that rule.  Defendants could have sought leave from the district court to file a *Daubert* reply brief,[35] but they chose not to do so.  Thus, Defendants' complaint that the Court did not permit them a separate *Daubert* reply does not provide a basis for Rule 23(f) review.

---

[30] MANUAL FOR COMPLEX LITIGATION § 11.32 at 43 (4th ed. 2004).

[31] *Chamberlan*, 402 F.3d at 959 (explaining that the unsettled and fundamental issue of law must be "important both to the specific litigation and generally").

[32] ECF No. 212.

[33] ECF No. 221-4; *see also* ECF No. 218 (explaining to the Court that Plaintiffs would be responding to Defendants' separate, non-substantive *Daubert* motion in Plaintiffs' class certification reply brief, in conformance with Local Rule 7-3).

[34] ECF No. 228.  Plaintiffs relied on the Hovenkamp treatise for the undisputed proposition that the before-and-after method has been used to calculate antitrust damages in U.S. civil cases since at least the 1920s.  *See* ECF No. 221-4 at 9 n.42. In fact, Defendants acknowledge its long pedigree.  *See* ECF No. 228 at 3.  And the text supports the adequacy of Dr. Connor's method, as discussed below at n.48.

[35] *E.g., Quezada v. Con-Way Freight, Inc*., No. 09-CV-03670-JSW, 2012 WL 4901423, at *1 n.1 (N.D. Cal. Oct 15, 2012).

**C.    Defendants Do Not Establish Manifest Error on the Face of the Petition.**

Defendants must establish a "significant" error that is "truly manifest, meaning easily ascertainable from the petition itself."[36]  Otherwise, "consideration of the petition will devolve into a time consuming consideration of the merits, and that delay could detract from planning for the trial in the district court."[37]  The "kind of error most likely to warrant interlocutory review will be one of law, as opposed to an incorrect application of law to facts."[38]  Finally, the error must be one that "inevitably will be overturned."[39]

### 1.    It Was Not Manifest Error for the District Court to Accept Plaintiffs' Common Methods of Proving Overcharges.

Defendants incorrectly assert that the district court committed manifest error in finding Dr. Connor's before-and-after model a sufficiently reliable method to prove higher over-order premiums ("OOPs") on a classwide basis.  Specifically, Defendants wrongly contend that Dr. Connor "deemed no causal factors worthy of inclusion apart from inflation."[40]  This fundamentally misstates his methodology.[41]

---

[36] *Chamberlan*, 402 F.3d at 959.

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] Petition at 11.

[41] In recently awarding Dr. Connor the Alfred E. Kahn Award for Antitrust Achievement, the American Antitrust Institute ("AAI") described Dr. Connor as "the world's leading cartel researcher" and his book, *Global Price Fixing*, as "the most comprehensive and most important study of cartels and cartel overcharges." The AAI also noted that "in 2009, his lifetime achievements in applied economics

In performing his overcharge analysis, Dr. Connor used OOP data produced by defendant Dairy Farmers of America, the nation's largest dairy cooperative.[42] Dr. Connor testified that he also "performed a correlation analysis between Dairylea's over-order premiums and DFA's and found a very high, significant correlation."[43] He also performed a correlation analysis on Dairylea's Class I and Class II over order premiums,[44] which showed a "very high positive correlation" and provided him with a reliable basis to infer from the econometric evidence and well-accepted economic theory that the effects of CWT's killing of cows on Class II products were similar to the Class I effects.[45]

Dr. Connor then analyzed fifteen years of data from cities across the country to create a before-and-after model of the OOPs charged by Defendants before, during, and after the cow-slaughter program. As Dr. Connor explained:

> [F]ollowing a relatively flat period, there was a steep increase in DFA's OOPs at the onset of the class period until the drop off at the end of the class period. The nature of the OOP time trends is important because of the

---

were recognized when he was given the highest honor of the Agricultural and Applied Economics Association, the title of Fellow." *See* ECF No. 244-4 (Plts' Supp. Brief) at 9 n.16 (citing http://www.antitrustinstitute.org/content/aai-award-john-m-connor-annual-achievement-award-cartel-research).

[42] ECF No. 235 (Joint Answer), ¶ 43.

[43] ECF No. 222-2 (Dr. Connor Depo.) at 171:20-22; *see also* ECF No. 206 (Dr. Connor Decl.), ¶ 83, n.42.

[44] ECF No. 206 (Dr. Connor Decl.), ¶ 83, n.42.

[45] ECF No. 222-2 (Dr. Connor Depo.) at 172:6-10. This refutes Defendants' argument that "he made no showing for the other six products" besides milk at issue in the case. *See* Petition at 18-19.

- 10 -

> strong resemblance to price trends observed when
> tracking prices before and during classic, historical cartel
> episodes: a period of low (often falling prices and
> profits), then a rapid rise to a peak before beginning to
> fall off.[46]

Dr. Connor concluded: "Based on my extensive experience evaluating successful

cartels, this fits the classic pattern."[47]

In conducting his before-and-after analysis, Dr. Connor controlled for the

changes in costs that may explain lawful price increases by using the Producer

Price Index for Farm Costs, which accounts for the other factors that Defendants

wrongly contend Dr. Connor ignored.[48]  Dr. Connor explains that the cooperatives

provided services before and after 2003, and that Defendants' expert "Mr. Kaplan

has not shown that any alleged increases in the costs of such services were not cap-

tured by general inflation in wholesale costs."[49]  Indeed, Mr. Kaplan agreed that all

of the relevant costs existed before the start of the class period,[50] which further

---

[46] *See* ECF No. 223-4 (Dr. Connor Rebuttal), ¶ 24; *see also* ECF No. 206 (Dr. Connor Decl.), Ex. I.

[47] ECF No. 223-4 (Dr. Connor Rebuttal), ¶ 23.  *See* Petition at 13.

[48] *See* Petition at 13-14.  This also distinguishes the cases cited in the Petition at 12.  Defendants also assert at n.5 that adjustments to the before-and-after method cannot simply rely on the discounting of dollars "to account for inflation or the Consumer Price Index," the reason according to the Hovenkamp treatise being that the "price of some products will rise by much more than the index, while the price of other products will rise by much less."  But that is precisely why Dr. Connor instead used the Producer Price Index for Farm Costs.  *See* ECF No. 257-4, ¶ 24.

[49] ECF No. 223-4 (Dr. Connor Rebuttal), ¶ 15.  And contrary to the Petition at 13, the inflation adjustment also controls for the global run up in commodity prices during the class period.  ECF No. 223-4 (Dr. Connor Rebuttal), ¶ 30.

[50] ECF No. 258-10 (Mr. Kaplan Depo.) at 80:8-81:20.

supports Dr. Connor's opinion that the Producer Price Index for Farm Costs controls for factors affecting price other than the conspiracy.

Moreover, Dr. Connor explained that increases in components of the OOP during the class period, such as fuel surcharges, are "classically used by cartels to extract higher prices."[51] Here again, Mr. Kaplan's testimony that the purported increases in service "charges" for transportation and rBST-free milk are distinct from and can certainly be higher than the actual "costs"[52] supports Dr. Connor's opinion that such "charges" are simply covers for cartel pricing.[53]

In short, Defendants fail to show that it is clear on the face of the Petition that the district court committed significant error that inevitably will be overturned. To the contrary, "[u]pon review of the evidence and Defendants' arguments regarding Dr. Connor's expert reports," the court correctly found that, because Dr. Connor's analysis "accounts for the major factors" as required by *Bazemore,*[54] "any failure to consider relevant factors goes to the weight of the evidence, as opposed to admissibility."[55] Thus, Defendants have not shown that the district court committed manifest error by rejecting Defendants' challenges to

---

[51] ECF No. 223-4 (Dr. Connor Rebuttal), ¶ 18.

[52] ECF No. 258-10 (Mr. Kaplan Depo.) at 159:7-9.

[53] ECF No. 257-4 (Dr. Connor Supp. Rebuttal), ¶ 24.

[54] Order at 11; *see id.* at 10 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).

[55] Order at 11.

Dr. Connor's opinion that common proof may be used to demonstrate that the conspiracy caused artificially higher OOPs on a classwide basis.

> **2.** **The District Court Performed a Rigorous Analysis and Properly Found That Dr. Connor Provides a Reliable Method to Demonstrate Impact and Damages Using Common Evidence.**

Next Defendants incorrectly argue that "[e]ven if the District Court was correct to admit the Plaintiffs' expert's opinions, the court still committed legal error in not fulfilling its obligation to look beyond admissibility in evaluating whether Plaintiffs had met their burden of proof under Rule 23."[56]  Specifically, Defendants assert that the court "disclaim[ed] any responsibility to rigorously analyze conflicting evidence."[57]  Not so.

At page 4 of its Order, the district court explained that it "must conduct a rigorous analysis to determine whether the requirements of Rule 23 have been met."  At page 6 of its Order, the court repeated that the "class can be certified only if the court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied" and that the "district court is *required* to examine the merits of the underlying claim in this context."[58]  And then, "[u]pon a rigorous analysis," the court correctly found "that Plaintiffs have met their burden to demonstrate that

---

[56] Petition at 15.

[57] *Id.* at 16.

[58] Emphasis added. This distinguishes *Ellis*, in which "the district court seemed to end its analysis of the plaintiffs' evidence [of common issues] after determining such evidence was merely admissible."  657 F.3d at 982.

damages from Defendants' alleged unlawful conduct may be calculated on a classwide basis."[59]  And in making that finding, the court explained that it had reviewed "the evidence and Defendants' arguments regarding Dr. Connor's expert reports."[60]  In light of the court's application of the correct Rule 23 standard and rigorous review of the expert reports, the court's class certification ruling is not manifestly erroneous.

Citing non-Ninth Circuit cases that are factually inapposite, Defendants incorrectly contend that the district court did not conduct the rigorous analysis that it said it did.[61]  But as this Court has explained, the Supreme Court "recognized over twenty years ago that a rigorous analysis does not always result in a lengthy explanation or in-depth review of the record."[62]  Instead, the issues can be "so plain and the analytical framework so clear that the record provide[s] a sufficient basis for the appellate court to make a decision, even though the district court's findings were conclusory."[63]  In determining that Dr. Connor's analysis "accounts for the

---

[59] Order at 10.  This can be contrasted with *In re Flash Memory Antitrust Litig*., 2011 WL 1301527, at *5 (N.D. Cal. Mar. 31, 2011), *see* Petition at 16, where the district court concluded that the plaintiffs' expert's "opinions lacked foundation and were uncompelling, and that Plaintiffs had thus failed to meet their burden" to establish that "common proof could be used to demonstrate that members of the proposed class of indirect purchasers suffered antitrust impact (or injury) from the alleged conspiracy to artificially inflate the cost of flash memory."

[60] Order at 11.

[61] *See* Petition at 9-10.

[62] *Chamberlan*, 402 F.3d at 961.

[63] *Id.*

major factors" as required by *Bazemore*, the district court conducted the requisite

rigorous analysis. "Requiring the district court to expand its analysis would

produce nothing more than a lengthy explanation of the obvious."[64]

Moreover, Defendants' reliance on *Ellis* is misplaced. There the district

court failed to resolve factual disputes required "to determine whether there was a

common pattern and practice that could affect the class as a whole."[65] And as this

Court explained, "If there is no evidence that the entire class was subject to the

same allegedly discriminatory practice, there is no question common to the

class."[66] Here, conversely, "the existence of the herd reduction program is

undisputed," such that expert testimony is unnecessary to establish a significant

common question – "whether Defendants violated the indirect purchaser antitrust

laws from the class states" based on that undisputed conduct.[67]

Finally, as in *Stockwell v. City & Cnty. of San Francisco*, "whatever the

failings of the class's statistical analysis, they affect every class member's claims

---

[64] *Id.* at 962.

[65] 657 F.3d at 983.

[66] *Id.* This also distinguishes *Aburto v. Verizon Cal., Inc.*, No. C 11-03683-ODW, 2012 WL 10381, at *5-6 (C.D. Cal. 2012) ("in the face of competing evidence" finding that "there is no evidence that the entire proposed class was misclassified as exempt" so "there is no question common to the class"). *See* Petition at 16.

[67] Order at 3, 9 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ("holding that even a single common question will do so long as that question has the capacity to generate a common answer apt to survive the resolution of the litigation")); *see also Chamberlan*, 402 F.3d at 962 ("[a]lthough the district court was succinct, it provided detailed substantive examples of the common issues").

uniformly."[68]  In *Stockwell*, this Court explained that in "highlighting the questions of statistical proof … the [defendant] has strengthened, not weakened, the case for certification, as it has identified a common question, the resolution of which will uniformly affect all members of the class."[69]  So too here.  The district court performed a rigorous analysis and found that Plaintiffs have presented a sufficiently reliable method to establish impact and damages using common evidence; any ultimate statistical failing of the model simply means that the claims of class members would fall together.[70]

### 3. Defendants Fail to Establish Manifest Error That Will Inevitably Result in Reversal on the Issue of Pass Through.

The district court determined that Plaintiffs have proposed a sufficiently reliable method to establish pass-through based on common proof by finding "[u]pon a rigorous analysis" that "Plaintiffs have met their burden to demonstrate that damages from Defendants' alleged unlawful conduct may be calculated on a classwide basis."[71]  Far from being manifestly erroneous, that finding is fully supported by the record.

To show that overcharges were passed on to indirect purchaser consumers, Dr. Connor ran a reduced-form model using consumer price index data collected

---

[68] 749 F.3d 1107, 1115 (9th Cir. 2014).

[69] *Id*. at 1116.  *See also Suchanek v. Strum Foods, Inc*., 764 F.3d 750, 757 (7th Cir. 2014).

[70] *Id*.

[71] Order at 10.

monthly from 2000 to 2013 by the Bureau of Labor Statistics of the U.S.

Department of Labor, as well as regional commercial retail data from A.C. Nielsen

Co.[72]  Dr. Connor's preliminary analysis demonstrated a pass-through rate of 89%

based on the BLS data[73] and 81% to 96% based on the Nielsen data.[74]  These pass-

through rates are consistent with pass-through analyses in the standard economic

literature with respect to farm-to-retail price transmission for fluid milk.[75]  They

are also consistent with charts in Defendants' documents showing that retail prices

track farm prices.[76]  Indeed, one such document admits that increases in farm

prices have an almost immediate effect on retail prices, which then lingers:  "Retail

prices tend to rise quickly when farm prices rise, but don't fall back as much when

---

[72] ECF No. 206 (Dr. Connor Decl.), ¶¶ 108-116.

[73] ECF No. 206 (Dr. Connor Decl.), ¶ 114.  *See In re Southeast Milk Antitrust Litig.*, 739 F.3d 262, 281 (6th Cir. 2014) ("a nationwide estimate of demand elasticity that is used to predict the reaction of retailers in the southeast to a price increase would be a reliable method of calculation").

[74] ECF No. 206 (Dr. Connor Decl.), ¶ 116.  Defendants' contention that there is regional variation in pass-through rates, *see* Petition at 17, is misplaced, because for each class state the corresponding regional pass-through rate is employed. Plaintiffs need not establish uniform damages among class members.  Moreover, "[t]hat some products diverged from the trend is insufficient to demonstrate the overall unreliability of [an expert]'s method."  *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-01819 CW, 2010 WL 5071694, at *5 (N.D. Cal. Dec. 7, 2010).  *See also* ECF No. 223-4 (Dr. Connor Rebuttal), ¶¶ 46-62 (opining regarding appropriateness of common pass-through rates).

[75] ECF No. 206 (Dr. Connor Decl.), ¶¶ 102-107.  Dr. Connor also discusses how the "downstream industries comprising the vertical milk subsector are hospitable for the passing-on of damages from the farm to retail levels."  *Id.*, ¶ 30; *see also id.*, ¶¶ 41-43.

[76] *E.g.*, ECF No. 187-97.

the farm price drops."[77]  Here again, "[r]equiring the district court to expand its analysis would produce nothing more than a lengthy explanation of the obvious."[78]

Defendants' major attack on Dr. Connor's analysis is that he "focused on showing that changes in the total price of milk were passed on to consumers," which Defendants wrongly contend "is insufficient to show pass-through of premiums."[79]  But Dr. Connor explained that he used the standard method to evaluate pass-through, and that Mr. Kaplan offers no basis for "his remarkable proposition that milk processors treat OOPs differently from the rest of the raw milk price in determining whether to pass their costs along the distribution chain."[80]  Moreover, even assuming for the sake of argument that Mr. Kaplan is correct on the merits (he emphatically is not), his unsupported proposition presents a classwide issue.  Thus, Defendants' attack "strengthen[s], not weaken[s], the case for certification," because it presents "a common question, the resolution of which will uniformly affect all members of the class."[81]

Defendants also incorrectly contend that the need for additional data for certain states is manifest error under the First Circuit's decision in *In re New Motor*

---

[77] *Id.*

[78] *Chamberlan*, 402 F.3d at 962.

[79] Petition at 17.

[80] ECF No. 223-4 (Dr. Connor Rebuttal), ¶ 73; *see also* ECF No. 206 (Dr. Connor Decl.), ¶ 113 & Ex. L.

[81] *Stockwell*, 749 F.3d at 1116.

*Vehicles Canadian Exp. Antitrust Litig.*[82]  But in that case the expert did not

establish the existence of the type of data needed for the reliable operation of his

model,[83] as Dr. Connor did here in actually generating damages estimates.[84]  And

where additional data is necessary, it will be obtained during merits discovery,

allowing for the reliable operation of the model for other states.

Moreover, Defendants falsely assert that Dr. Connor "discarded the available

data for California and Oregon because it pointed to results inconsistent with his

expected findings."[85]  DFA's Senior Vice President and Chief Fluid Marketing

Officer submitted a declaration attesting to rising surcharges for rBST-free milk in

California and Oregon,[86] while at the same time the DFA data showed flat OOPs in

those states.[87]  There can be no question that such data is suspect and warrants

further investigation.  As Dr. Connor explained, this "data is probably not being

reported correctly."[88]  Even Mr. Kaplan agrees that it is possible to "have a

---

[82] 522 F.3d 6 (1st Cir. 2008).

[83] *Id.* at 28 ("Professor Hall claimed that data in defendants' hands would provide the information he would need for his damages model.").

[84] *E.g.,* ECF No. 245-4 (Dr. Connor Supp. Decl.), ¶ 12.

[85] Petition at 18 n.8.

[86] ECF No. 210-2 (Wilson Decl.), ¶¶ 14-16, Ex. 1.

[87] ECF No. 254-4 (Mr. Kaplan Supp. Decl.), Exs. C & J.

[88] ECF No. 258-9 (Dr. Connor Depo.) at 75:17-18.  *See also* ECF No. 257-4 (Dr. Connor Supp. Rebuttal), ¶ 14 ("More suspect, the[se] OOPs are notably non-responsive to numerous purported cost changes for the defendants….").

situation within a data set where you have some observations that are reliable, and other observations that are unreliable."[89]

In short, Defendants have not established a manifest error that will inevitably result in reversal.[90]  Instead, the district court correctly concluded that "Plaintiffs' expert set forth a damages model that is capable of calculating the allegedly inflated prices that class members paid in each class state as a result of the nationwide conspiracy."[91]

## VI.  CONCLUSION

For these reasons, Defendants' Petition should be denied.

Respectfully submitted,

Dated: October 13, 2014                    HAGENS BERMAN SOBOL SHAPIRO LLP

---

[89] ECF No. 258-10 (Mr. Kaplan Depo.) at 85:18-23.

[90] The cases cited by Defendants are inapposite.  *See* Petition at 16-17 n.7.  In *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 164 (N.D. Cal. 2001), the expert (also Dr. Connor) provided only a "brief, generic description of how pass-through rates may be calculated for the indirect purchasers," whereas here Dr. Connor calculated them. In *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 504 (N.D. Cal. 2008), the court concluded that the expert had "demonstrated no class-wide formulae that would be reliable in assessing impact on each consumer," because, unlike here, the expert "was forced to use different variables in each of her reseller-specific regressions."  In *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253425, at *8-9 (E.D. Pa. Aug. 3, 2007), the court rejected the expert's analysis based on the flawed premise, not present here, that "the buyer has somehow suffered injury even though he did not pay any more for the home than he would have absent any conspiracy."  Finally, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013), *see* Petition at 19, is inapplicable because the plaintiff's expert "conceded [his report] measured overcharges to legacy shippers and class members alike," even though legacy shippers could not have been injured by the alleged conduct.

[91] Order at 11.

By: /s/ Elaine T. Byszewski
Elaine T. Byszewski
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
Email: elaine@hbsslaw.com

Steve W. Berman
Craig Spiegel
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Email: steve@hbsslaw.com
Email: craig@hbsslaw.com

Jeff D. Friedman
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Email: jefff@hbsslaw.com

Daniel E. Gustafson
Jason S. Kilene
Sara Payne
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Email: dgustafson@gustafsongluek.com
Email: jkilene@gustafsongluek.com
Email: spayne@gustafsongluek.com

Steven N. Berk
BERK LAW PLLC
2002 Massachusetts Avenue NW
Washington, D.C. 20036
Telephone: (202) 232-7550
Email: steven@berklawdc.com

Mark Reinhardt
Garrett D. Blanchfield
REINHARDT WENDORF & BLANCHFIELD
332 Minnesota Street, Suite 1250
St. Paul, MN 55101
Telephone: (651) 287-2100
Email: m.reinhardt@rwblawfirm.com
Email: g.blanchfield@rwblawfirm.com

Sheptim Ademi
Corey M. Mather
ADEMI & O'REILLY LLP
3620 East Layton Avenue
Cudahy, WI 53110
Telephone: (414) 482-8000
Email: sademi@ademilaw.com
Email: cmather@ademilaw.com

*Attorneys for Plaintiffs-Respondents*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 13, 2014, I electronically filed the foregoing document using the Appellate ECF system which will send notification of such filing to the e-mail addresses registered in the Appellate ECF system, as denoted on the Electronic Mail Notice List.

I further certify that on October 13, 2014, the foregoing document was served upon the following case participant via first class mail:

Andrew J. Lee
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC  20036

/s/ Elaine T. Byszewski
Elaine T. Byszewski